**Marie P. GARVIN, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 01 CIV. 4532(JGK).**

United States District Court, S.D. New York.

March 31, 2003.

**OPINION AND ORDER**

KOELTL, District Judge.

The plaintiff, Marie P. Garvin ("Garvin"), brings this action pursuant to 42 U.S.C. § 405(g). The plaintiff seeks re-

view of a final determination of the Commissioner of Social Security ("Commissioner") determining that the plaintiff was not entitled to disability insurance benefits ("DIB").[1] The plaintiff and the defendant both move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

The issue on this motion is whether substantial evidence supports the Commissioner's finding that the plaintiff is not "disabled" as the term is defined in the Social Security Act ("the Act") for the period for which she seeks DIB, November 22, 1997 (the initial onset date) through October 10, 2000 (the date of the Administrative Law Judge's ("ALJ") decision denying DIB). *See* 42 U.S.C. § 423(d)(1)(A) (defining disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months").

The plaintiff filed an application for DIB on January 25, 1999 in which she alleged that she was disabled since November 22, 1997. (R. at 61.) The application was initially denied on March 26, 1999. (R. at 39–42.) The application was denied again upon reconsideration on January 20, 2000 (R. at 44–46.)

On September 12, 2000, a hearing was held on the plaintiff's claim before an ALJ. (R. at 20–33.) The plaintiff was represented by counsel at the hearing. (R. at 9, 19.) The plaintiff alleged that she was "unable to work due to constant right knee and right shoulder pain and instability." (R. at 10.) Garvin testified that she takes prescription Motrin and Advil to manage her pain. (R. at 26.) Garvin reported that her shoulder injury inhibited her ability to do things for a long period of time that require reaching or pulling, and that she was limited by severe pain and spasms in her neck and shoulder. (R. at 23.) The plaintiff testified that she could reach about mid-way over her head. (R. at 24.) Garvin informed the ALJ that she was scheduled to undergo further surgery on her right shoulder on September 28, 2000. (R. at 30–31.) She also indicated that she had received arthrospcopic surgery on her right knee in June 1998 and that the knee had started to bother her again in March or April 2000 for no apparent reason. (R. at 31.)

The ALJ considered the case *de novo*, and on October 10, 2000 found that the plaintiff was not disabled under the Act. (R. at 17–18.) The ALJ's decision became the final decision of the Commissioner on April 20, 2001 when the Appeals Council denied the plaintiff's request for review. (R. at 3–5.)

## I.

The administrative record contains the following facts. The plaintiff was born on November 29, 1955. (R. at 61.) Garvin speaks and reads English and has a GED. (R. at 67, 74.) Until November 1997, the plaintiff worked as a corrections officer. (R. at 69.) The plaintiff lives with her spouse and children. (R. at 84.) She is able to shop for groceries and to cook by herself and performs these activities three to four times per week. (*Id.*) She is able to perform household chores with her children two to three times per week. (*Id.*) Her other activities include reading, watching TV, and listening to the radio. (*Id.*)

---

1. On November 9, 2001, Jo Anne B. Barnhart was sworn in as Commissioner of Social Security. She is automatically substituted as the defendant in this case pursuant to Fed. R.Civ.P. 25(d)(1).

The plaintiff was injured on the job on November 22, 1997 when she was kicked in the shoulder while trying to restrain an inmate. (R. at 68, 75, 154.) She was terminated from her job for being absent for over one year. (R. at 68.) The plaintiff receives Workers' Compensation, and has applied for retirement benefits from her former employer. (R. at 27.) The plaintiff has not worked since 1997. (*Id.*)

The plaintiff was examined for the first time by her treating physician, Dr. L. Paul Brief ("Dr.Brief"), on August 11, 1993. (R. at 119.) At that time, the plaintiff complained of pain in the right knee, hip, shoulder and hand caused by an incident on May 13, 1993 when she was forced to restrain a violent prisoner while working as a corrections officer. (*Id.*) Upon examination, the knee moved well and had normal range of motion with no evidence of instability or swelling although there was tenderness. (*Id.*) The right shoulder revealed some pain at the extreme amount of abduction and the hip moved well. (*Id.*) The hand showed a weak grip with normal motor power. (*Id.*) Dr. Brief listed his impressions as 1) acute traumatic internal derangement of the right knee, 2) internal derangement of the right shoulder, and 3) acute cervical strain. (*Id.*) He requested authorization for a magnetic resonance imaging ("MRI") of the knee and instructed the plaintiff to curtail her activities. (*Id.*)

Dr. Brief recorded on March 2, 1994 that an MRI revealed a questionable tear but that examination showed the plaintiff's knee to be stable. (*Id.*) On March 23, 1994 he wrote that he doubted "actual ACL tear but probably problem is mostly soft tissue." (*Id.*) The plaintiff was seen by Dr. Brief five times between April 1994 and October 1994. (R. at 118, 181.)

The plaintiff next saw Dr. Brief on July 16, 1996 after reinjuring her right knee on July 1, 1996 in a fall at work. (R. at 117, 179.) On September 4, 1996 Dr. Brief

noted that the plaintiff was still awaiting authorization for operative arthroscopy for the right knee which she had been awaiting since March 1994. (R. at 117–19.) On June 18, 1998 the plaintiff underwent operative arthroscopy on her right knee. (R. at 117, 179.) Dr. Brief reported performing arthroscopic surgery on the right knee, a partial synovectomy, ACL repair, removal of a loose body, and resection ligamentum mucosum. (*Id.*) In July and August of 1998, Dr. Brief noted continued improvement in the knee. (*Id.*)

After the November 22, 1997 incident, the plaintiff saw Dr. Brief on December 9, 1997 complaining of right shoulder pain. (R. at 116.) Dr. Brief's impressions were of acute traumatic myositis of the right shoulder, impingement syndrome of the right shoulder, and acute cervical strain. (*Id.*) The plaintiff's treatment included a cortisone injection and physical therapy. (R. at 116, 154–55.) The plaintiff continued complaining of shoulder pain in 1998 and Dr. Brief sought authorization for right shoulder arthroscopic surgery, which he received in January 1999. (R. at 116.)

The plaintiff was treated by a chiropractor, Dr. Richard Gregory ("Dr.Gregory"), from November 25, 1997 through March 3, 1999. (R. at 110–13, 190.) In February 1999, Dr. Gregory described the plaintiff's symptoms as neck pain, pain and weakness in the right arm, and dorsal and lower back pain. (R. at 103.) In a report dated March 2, 1999, Dr. Gregory opined that, "The patient is not able to perform any normal work related tasks" with her right arm because of pain and restrictions in the right shoulder. (R. at 105.) The doctor reported no limitations with regard to Garvin's ability to stand, walk, or sit. (R. at 106.) He did limit the maximum number of pounds she could lift or carry to 2–5 pounds in short lifts with no sustained lifting. (*Id.*) The doctor reported that "the

normal movement of the arm during walking inflames the shoulder and causes increased pain." (*Id.*) He also recorded that the plaintiff's shoulder was "unable to handle the force of pushing and pulling actions." (*Id.*)

On March 16, 1999 Dr. Brief examined the plaintiff and recorded impressions of impingement syndrome and subacromial spur in the right shoulder. (R. at 162.) Garvin's right shoulder revealed decreased range of motion and x-rays showed a type 3 acromiom with a sharp spur and a down curve. (*Id.*) Dr. Brief performed surgery on the shoulder on March 18, 1999. (R. at 165–66.) The procedures done were 1) an arthroscopy of the right shoulder, 2) subacromial decompression with bur osteotomy of subacromial spur, 3) bur osteotomy of subclavicular spur, 4) resection of the coracoacromial ligament, and 5) resection of the subacromial bursa. (R. at 178.)

Garvin attended physical therapy between April and August 1999. (R. at 148–53.) By July 20, 1999, Dr. Brief observed no evidence of shoulder impingement. (R. at 178, 186, 247.) The plaintiff finished physical therapy on August 19, 1999 and was instructed to follow a home exercise plan. (R. at 145, 148.) By the time she completed physical therapy, the plaintiff's range of motion for the right shoulder was within normal limits, and her manual muscle test revealed 4+ out of 5 strength. (R. at 148.) As of August 23, 1999 she had full range of motion and her shoulder was nontender. (R. at 145.) She experienced shoulder pain only with heavy activity or exercise and her strength was returning. (*Id.*)

Dr. Brief completed a report for the plaintiff for the State of New York Workers' Compensation Board on the plaintiff on September 8, 1999. (R. at 185.) Dr. Brief diagnosed the plaintiff with "Other Affections of Shoulder" and "Neck Sprain" and indicated that "Potential for perma-nent disability exists." (*Id.*) He also noted that the plaintiff's "Motion [was] good" and that "impingement signs [were] negative." (*Id.*) He noted that the plaintiff expected to return to work on October 4, 1999. (*Id.*) Dr. Gregory completed a report for the Workers' Compensation Board on October 13, 1999. (R. at 184.) Dr. Gregory diagnosed the plaintiff with "Cervical sprain/strain" and "Cervical Myofascitis" and indicated that the plaintiff was totally disabled. (*Id.*)

Garvin was examined by Dr. Michael Robinson ("Dr.Robinson"), a consultative physician, on December 28, 1999. (R. at 217–18.) Garvin complained of dull and aching pain in the shoulder and in the upper trapezius region that was exacerbated by lifting and carrying, and particularly by overhead activities. (R. at 217.) She also noted persistent numbness in the radial three digits of the right hand. (*Id.*) However, she stated, she had recently begun to experience good improvement with her pain. (*Id.*) The plaintiff was able to do household activities and grocery shopping, lift grocery bags weighing upwards of 10 to 15 pounds, and to drive. (Tr. at 217–18.)

Upon examination, the plaintiff showed passive range of motion across all joints including the shoulder with "some voluntary splinting." (Tr. at 218.) Cervical range was also full in all planes, including flexion, extension, rotation and lateral bending. (*Id.*) Strength was normal throughout the muscle groups. (*Id.*) Sensation to light touch, pinprick, and vibration was intact across all dermatomes except for the right hand in which pinprick was diminished in the radial three digits. (*Id.*) Range of motion, strength, and sensation was within normal limits for the lower extremities. (*Id.*) X-rays of Garvin's cervical spine, right knee, and right shoulder were all normal. (R. at 115.)

Dr. Robinson's assessment was that Garvin presented with symptoms consistent with a right rotator cuff partial thickness tear status post decompression in March 1999. (R. at 218.) He also found a suggestion of a possible right C6 radiculopathy, possibly associated with Garvin's persistent upper extremity numbness and pain. (*Id.*) Dr. Robinson found a fair to good likelihood of significant improvement with continued conservative management. (*Id.*)

Dr. Robinson found Garvin to have minimal functional limitations regarding lifting from floor to waist, and moderate limitations regarding lifting from waist to overhead. (*Id.*) Dr. Robinson found no significant limitations with regard to standing, walking, sitting, or handling. (*Id.*) Robinson concluded that "[i]t would be anticipated that she should be able to work at a light to sedentary level of physical exertion despite her impairment with the particular limitation of overhead activities taken into consideration." (*Id.*)

Garvin underwent an MRI on the right shoulder on May 26, 2000. (R. at 253–54.) The imaging revealed hypertrophic changes of the acromioclavicular joint that were less prominent than when Garvin underwent a previous MRI on September 28, 1999 which may have been related to a subacromial decompression. (*Id.*) The MRI also showed abnormal signal in the supraspinatus tendon consistent with a partial thickness tear that was similar in appearance to the September 28, 1999 MRI. (*Id.*)

A variety of forms have been submitted to the New York State Workers' Compensation Board on the plaintiff's behalf. On March 7, 2000 Dr. Brief completed a form in which he indicated that Garvin's shoulder and neck injuries resulted in a disability that was partial, permanent, and severe. (R. at 246.) On May 23, 2000 Dr. Brief characterized Garvin's disability as partial, permanent, and mild, while noting that the potential for permanent disability existed. (R. at 248.) The plaintiff's disability was recorded as partial, permanent, and severe by Dr. Brief on August 2, 2000. (R. at 251.)

In August 2000, Dr. Gregory completed a "Medical Source Statement of Ability to do Work–Related Activities." (R. at 237–240.) Dr. Gregory indicated that the plaintiff was only able to lift or carry items weighing less than ten pounds on an occasional basis and that her ability to push or pull was also limited. (R. at 237–38.) Her ability to stand, walk, or sit was not limited. (*Id.*) He stated that she could not climb or crawl. (R. at 238.)

Dr. Brief also completed a "Medical Source Statement of Ability to do Work–Related Activities" on September 5, 2000. (R. at 230–32, 255–57.) Dr. Brief reported that Garvin could lift or carry items weighing up to ten pounds on an occasional basis, and that she had a limited ability to push or pull with her upper extremities. (R. at 230–31, 255–56.) There were no limitations on the plaintiff's ability to stand, walk, or sit. (R. at 230–31.) Dr. Brief recorded that Garvin had impingement signs and limited range of shoulder motion. (R. at 231, 256.) Dr. Brief noted that the plaintiff was unable to assume any position or activity requiring assistance of her arms or shoulders for getting up or down. (R. at 231, 256.)

After the plaintiff's September 10, 2000 hearing before the ALJ, Dr. Brief completed another form for the New York Workers' Compensation Board dated September 27, 2000. (R. at 264.) The plaintiff's disability was characterized as partial, severe, and permanent. (*Id.*) The following day, on September 28, 2000, Dr. Brief performed surgery on Garvin's right shoulder. (R. at 263.) The procedure consisted of 1) open osteotomy-resection of massive suba-

cromial spur for decompression, 2) open arthrotomy-resection of lateral aspect clavicle, 3) resection of subacromial bursa, and 4) release-resection of the CA ligament. (*Id.*) By October 3, 2000 the plaintiff had started physical therapy. (*Id.*) X-rays showed a stable appearance of the shoulder structures. (*Id.*) The next day, Dr. Brief completed another form for the New York Workers' Compensation Board listing the plaintiff's disability as partial, severe, and permanent. (R. at 262.)

## II.

A court may set aside a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence in the record. *See* 42 U.S.C. §§ 405(g); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). Substantial evidence is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Diaz v. Shalala,* 59 F.3d 307, 312 (2d Cir.1995); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991).

The analytical framework for evaluating claims of disability is defined by regulations of the Commissioner, which set forth a five-step inquiry. *See* 20 C.F.R. § 404.1520. The Court of Appeals for the Second Circuit has described this five-step process as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical capacity to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000) (internal citation omitted); *see also Melville v. Apfel,* 198 F.3d 45, 51 (2d Cir.1999); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998); *Dixon v. Shalala,* 54 F.3d 1019, 1022 (2d Cir.1995); *Lora v. Massanari,* No. 00 Civ. 8958, 2002 WL 655208, at *5 (S.D.N.Y. Apr.18, 2002).

The claimant bears the initial burden of proving that she is disabled within the meaning of the Act. *See* 42 U.S.C. § 423(d)(5); *see also Shaw,* 221 F.3d at 132; *Rodriguez v. Apfel,* No. 96 Civ. 8330, 1998 WL 150981, at *7 (S.D.N.Y. Mar.31, 1998); *Maier v. Chater,* No. 95 Civ. 9264, 1997 WL 570938, at *3 (S.D.N.Y. Sept.5, 1997). This burden encompasses the first four steps described above. *See Rivera v. Schweiker,* 717 F.2d 719, 722 (2d Cir.1983). If the claimant satisfies the burden of proof through the fourth step, she has established a prima facie case and the

burden shifts to the Commissioner to prove the fifth step. *See id.* at 722–23; *see also Infante v. Apfel,* No. 97 Civ. 7689, 2001 WL 536930, at *4 (S.D.N.Y. May 21, 2001) (citing *Berry,* 675 F.2d at 467). In meeting her burden of proof on the fifth step, the Commissioner, under appropriate circumstances, may rely on the medical vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the grids."[2] The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education, and work experience. Based on these factors, the grids indicate whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the grids is dispositive on the issue of disability. However, the grids are not dispositive where they do not accurately represent a claimant's limitations because the claimant suffers from non-exertional limitations that significantly limit her capacity to work. *Pratts v. Chater,* 94 F.3d 34, 38 (2d Cir. 1996); *Rosa v. Commissioner of Social Sec.,* No. 97 Civ. 1615, 1998 WL 106134, at *3 (S.D.N.Y. Mar. 10, 1998); *Zorilla v. Chater,* 915 F.Supp. 662, 667 (S.D.N.Y. 1996).

### III.

■ Garvin alleges that the ALJ's decision must be reversed or remanded for further fact-finding because the ALJ's conclusion that Garvin has the residual functional capacity to perform sedentary work is not supported by substantial evidence.

The ALJ undertook the appropriate sequential inquiry in the plaintiff's case. First, the ALJ found that the plaintiff had not engaged in substantial gainful activity since November 22, 1997. (R. at 10.) Second, the ALJ found that the plaintiff had a severe impairment of her right knee and right shoulder under the Act. (R. at 11.) Third, the ALJ determined that Garvin's impairments did not meet or equal the medical criteria of any condition described in the Listings of Impairments contained in 20 C.F.R. Part 404, Appendix 1 to Subpart P. (R. at 11–15, 17.) In association with this finding, the ALJ concluded that Garvin's testimony as to her pain and other symptoms was out of proportion and not wholly credible when compared to the impairments established by the medical findings in the record and was not supported by the objective clinical findings in the record. (R. at 15.) The ALJ found that Garvin was able to sit for up to eight hours on a sustained basis in a work environment and to stand or walk for up to eight hours during the course of an eight hour work day. (*Id.*) The plaintiff could frequently and occasionally lift and carry objects ten pounds or less with her left hand, and five pounds or less with her right hand. (*Id.*) She was, however, limited in her ability to engage in activities requiring more than frequent overhead reaching. (*Id.*) According to the ALJ, the medical evidence established that Garvin had at least the residual functional capacity for the full range of sedentary exertion level work. (*Id.*) As the fourth step, the ALJ determined that the plaintiff was unable to perform her past relevant work because her job as a corrections officer was performed at a "heavy" exertion level. (R. at 15–16.)

With respect to the fifth and final step, for which the Commissioner bears the burden of proof, the ALJ evaluated Garvin's age, education, and work experience. (R.

---

**2.** The grids classify work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling.

at 16.) Garvin was classified as a "younger individual" pursuant to 20 C.F.R. § 404.1563; she graduated high school; and she had past relevant work experience as a corrections officer. (R. at 17.) The objective medical evidence established that Garvin could at least perform the full range of work at the sedentary exertion level.[3] (*Id.*) Applying these factors to the grids, the ALJ concluded that the plaintiff was not disabled and was not entitled to receive DIB. (*Id.*)

There is substantial evidence in the record supporting the ALJ's finding that the plaintiff is not disabled and can instead perform sedentary work. Dr. Brief, Garvin's treating physician, indicated on September 5, 2000, just one week before Garvin's hearing, that Garvin could lift or carry ten pounds, and that there were no limitations on her ability to stand, sit, or walk. (R. at 230–32.) This assessment supports the conclusion that Garvin can perform sedentary work. *See* 20 C.F.R. § 404.1567(a). The ALJ accorded great weight to Dr. Brief's opinion because it was well supported by medically accepted clinical and laboratory diagnostic techniques. (R. at 14.) *See* 20 C.F.R. § 404.1527(d)(2). In this case, Dr. Brief's opinion, as the treating physician, is controlling. *See* 20 C.F.R. § 404.1527(d)(2); *see also Lora,* 2002 WL 655208, at *5.

The ALJ noted that Dr. Gregory also found that Garvin's ability to sit or stand was not impaired. (R. at 14.) While this conclusion is consistent with that of Dr. Brief, Dr. Gregory's assessment is not en-

titled to controlling weight because, as a chiropractor, he is not an acceptable medical source. 20 C.F.R. §§ 404.1513, 404.1527; *see also Diaz v. Shalala,* 59 F.3d 307, 313 (2d Cir.1995). Thus, the fact that Dr. Gregory concluded that the plaintiff could lift or carry less than ten pounds, (R. at 106, 237), does not preclude a finding that she was capable of sedentary work.

Based on the relevant evidence, the ALJ concluded that:

> The findings and opinions of Drs. Brief and Gregory show that the claimant has been—overall—limited to work at the sedentary exertion level with limitations with respect to her ability to engage in activities requiring more than frequent overhead reaching with the right arm. The claimant's statements of totally disabling symptoms and limitations are just not supported by the objective medical evidence and are not consistent with the record when considered in its entirety.

(R. at 14.) There is substantial evidence in the record to support the ALJ's determination that the plaintiff can perform sedentary work. Moreover, the ALJ's finding that the plaintiff's subjective complaints of pain were not wholly credible or consistent with the record is supported by the record. *See Centano v. Apfel,* 73 F.Supp.2d 333, 338 (S.D.N.Y.1999).

The plaintiff alleges that the ALJ's finding that Garvin can perform sedentary work is erroneous because the ALJ failed to consider the fact that Garvin's pain resulted in Dr. Brief's performing another

---

**3.** 20 C.F.R. § 404.1567(a) defines sedentary work:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Further, it is generally agreed by the Commissioner and the Court of Appeals for the Second Circuit that sedentary work generally involves sitting for six hours out of an eight-hour day. *See Ferraris v. Heckler,* 728 F.2d 582, 587 n. 3 (2d Cir.1984); *DeJesus v. Chater,* 899 F.Supp. 1171, 1176 (S.D.N.Y.1995).

shoulder surgery on September 28, 2000. The plaintiff contends that the ALJ's failure to account for this second surgery in his decision demonstrates the ALJ's insufficient consideration of Garvin's pain. The plaintiff argues that the second shoulder surgery validates her complaints of pain which the ALJ questioned.

The plaintiff did not present the ALJ with specific information about her future shoulder surgery prior to the issuance of his decision denying DIB. At Garvin's hearing, she testified that she was scheduled for further surgery on her right shoulder on September 28, 2000. (R. at 30–31.) She did not provide more details about the surgery. In a position paper submitted to the ALJ on the day after the hearing, September 11, 2000, plaintiff's counsel also reported that Dr. Brief had received authorization for open repair right shoulder surgery on August 11, 2000 but did not give more details about the procedure or the diagnosis. (R. at 245.) Nor were accompanying medical records submitted to amplify the record of the shoulder surgery. There is no evidence that the ALJ improperly ignored the medical evidence on the record before him.

■ After the ALJ's decision, the plaintiff submitted evidence about the surgery, including Dr. Brief's records, to the Appeals Council. (R. at 260–64.) The plaintiff argued that the ALJ failed to properly account for the September 28, 2000 surgery in rendering his opinion. The Appeals Council considered the plaintiff's contention but denied the plaintiff's request for review. (R. at 3.)

Moreover, the plaintiff has not demonstrated that anything about the September 28, 2000 surgery was disabling or would have changed the ALJ's decision. Following the surgery, the plaintiff began range of motion exercises and physical therapy.

(R. at 263.) Post-surgical x-rays showed stable appearance in the structures of the shoulder. (*Id.*) Evidence that nothing about the surgery appeared to worsen her condition can be seen in the fact that Dr. Brief listed the plaintiff's disability as severe, permanent, and partial on Workers' Compensation forms completed both before and after the surgery. (Tr. 262, 264.) There are no records from Dr. Brief that change the assessment that he provided and which were submitted to the ALJ that showed that the plaintiff was capable of performing sedentary work. Thus, there is no evidence that the plaintiff is not capable of performing sedentary work following the surgery. However, if the plaintiff's condition has worsened, she may reapply for DIB. *See Parker v. Sullivan,* No. 91 Civ. 981, 1992 WL 77552, at *6 (S.D.N.Y. Apr.8, 1992).

## CONCLUSION

There is substantial evidence to support the Commissioner's determination that the plaintiff was not disabled under the Act and is not entitled to DIB. Therefore, the defendant's motion for judgment on the pleadings is granted and the plaintiff's motion is denied. The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**